## ROBERTS *v.* THE STATE.

1. The evidence fully authorized the jury to find that the deceased was murdered, that the accused was the murderer, and that the defense of insanity was not sustained.
2. The circumstances tending to show that the deceased was killed with the instrument named in the indictment were sufficient to warrant the jury in finding that this charge was sustained.
3. When the body of a woman alleged to have been murdered was found upon a bed in a room of the house which she occupied as a dwelling, with the head crushed in two places, in such a manner as to indicate that the fatal wounds were inflicted with some blunt, smooth, and round instrument, which crushed the skull without breaking the skin, such as a pole or piece of iron piping, and, shortly after the discovery of the body, bloody bedclothes were found behind a cot in the same room, and a curtain pole fractured about the middle, the breaks appearing to be fresh, was found behind a trunk in an adjoining room, such pole, upon being identified by witnesses who so found it, was admissible in evidence upon the trial of the person charged with the murder.
4. When the facts above indicated were shown by the evidence and the pole was introduced, the solicitor-general had the right, in his argument to the jury, to contend that this pole was the weapon used by the murderer.
5. When a husband is on trial for the alleged murder of his wife, evidence tending to show a long course of ill-treatment and cruelty on his part toward her, continuing until shortly before the homicide, is admissible. Such evidence tends to show malice and motive, and to rebut the presumed improbability of a husband murdering his wife.
6. The testimony of a witness that, on a given occasion, a particular person appeared to be excited, or did not so appear, is not subject to objection upon the ground that it is a mere opinion or conclusion of the witness, and therefore inadmissible.
7. Upon the trial of a criminal case, it is not error for the judge to shape his general charge to the jury upon the evidence alone; but he should, at some stage of the charge, appropriately instruct the jury with reference to the prisoner's statement.
8. The trial judge fully instructed the jury in reference to the law applicable to the defense of insanity and the amount of mental capacity necessary to commit the crime charged, and did not err in failing to repeat the charge

upon the subject of such mental capacity, in immediate connection with his instruction that if the jury should find that the accused took the life of the deceased as charged, and was at the time of such mental unsoundness as to be incapable of committing a crime, they should acquit him.

9. There was no error in refusing to charge that the defendant had introduced evidence of his insanity at the time the alleged offense was committed, and that if the jury believed, from a preponderance of the evidence, that at the time of the alleged offense the accused was insane, they should acquit him.

10. The fact that the solicitor-general, after asking a witness for the accused if he had not, during the course of his examination, made a certain statement, and eliciting from the witness the reply that he had not, said to the witness, in the hearing of the jury, "I say that you did," is not cause for a new trial, although the statement of the prosecuting officer was objected to at the time and the court failed to rebuke his improper conduct; as the jury, having heard all the testimony of the witness, were not at all likely to be misled by such statement, and the particular question about which the dispute arose was immaterial.

Argued May 16,— Decided June 13, 1905.

Indictment for murder.   Before Judge Henry.   Walker superior court.   March 29, 1905.

Roberts was indicted for the murder of his wife, and upon his trial, in February of the present year, he was convicted upon evidence which was wholly circumstantial.   He made a motion for a new trial, which was overruled, and he excepted. The grounds of the motion were:   (1–3) That the verdict was contrary to the law and the evidence and without evidence to support it.   (4) Because the indictment charged that the offense was committed by striking the deceased with a curtain pole, and the evidence wholly failed to show that it was committed in this way.   (5) Because the verdict was strongly against the weight of the evidence introduced to show the insanity of the accused at the time the alleged crime was committed. (6) Because the evidence clearly showed that at the time of the homicide the accused was of such unsoundness of mind as to be incapable of forming a criminal intent.   (7) Because J. S. Wilson was permitted, over the objection of the defendant, to testify as follows:   "On New Year's morning I passed Mr. Roberts's home.   He was in the house and seemed to be going from one part of the house to the other.   He was saying 'God damn' something or other.   I didn't understand what names he used. I didn't understand very much.   He was talking to his wife; I

heard her say 'Papa' a time or two. That was all I heard her say." (8) Because this witness was allowed to testify: "He (defendant) did not appear to be excited when he came to me in the woods. After I got back from Chattanooga he appeared to be excited. That was both before and after his children came." (9) Because the court permitted J. P. Tucker to testify: "I don't know whether he (defendant) appeared to be excited or not when I got there (to his house); he seemed to be in trouble or something, he was taking on a great deal about it." (10) Because the following evidence of Mrs. DeWitte was illegally admitted: "Last summer I heard Mr. Roberts call his wife an old bitch. I guess that is about all I heard. Mr. Roberts was sitting at the east side of the house and Mrs. Roberts was sitting on the ground by a tree when he called her that. I saw Mr. Roberts hit his wife on the day before Thanksgiving, last November, with what looked like a piece of board. I reckon he was angry, or he would not have hit her. I heard Mrs. Roberts scream. I was in my yard, and I saw Mr. Roberts drag her from the north end of the house to the west of the porch, and he struck her just as she went on the porch. She was running at the time, and he was after her. She was screaming; that is what attracted my attention. He struck her awful hard. I heard the lick. He struck her once." (11) Because "a curtain pole, shivered about the middle, which had been identified by witness W. H. Henderson as a pole found in defendant's house, in an adjoining room from that in which the remains of deceased lay, behind a trunk, the day after the homicide, and which was offered in evidence by the State after the defendant had closed his testimony, was illegally admitted" in evidence. (12) Because the following testimony of Miss Lollie Roberts, who testified in rebuttal for the State, was illegally admitted: "My father (defendant) would call her (deceased) a bitch and a bastard, and would always be constantly calling her some words like that. This was frequently during the time I lived at home (prior to 1903). He would call her a damn bastard and a damn bitch. I have heard him use such words ever since I can remember, to my mother. He would come in and be angry about something on the street, and come in cursing and drinking. For instance, if he would speak to her and she did not hear him, he would curse her. If he would be

talking to her and she would be speaking to one of us and not hear him, it would make him mad and he would curse her then. When he came back from Georgia (in October, 1903), we heard our mother screaming in the side .room, and I went in there and saw her on the floor, and he was standing over her with a knife in his hands. When he first saw me, he pushed me over her and I pushed him back, and I started to help her up and he came at me with the knife, and I pushed him again and the knife dropped, and when I pushed him again a second time he fell. She was on the floor, with her nose bleeding, and he had the knife in his hands striking at her. I can't remember exactly what my mother said at the time. I just remember her saying, 'Please, Papa, don't kill me,' and then I heard her call my name to come to her. This was when we lived on Catherine street, before we moved. When he was cursing her he would dare her to answer him back, and when she answered him I have heard him say he would beat her brains out with the poker that he had, or anything that he would have in his hands. He would beat her brains out if she would answer him. I have heard this on more than one occasion. He wouldn't always have the same thing in his hands, and it wouldn't be the same reason, but I have heard him threaten her life several times. He would dare her to go to my sister's house, and I have heard him tell her if she went over there he would kill her. On one occasion — I can't remember exactly when it was, but I remember the time — he was drinking, and I persuaded my mother to come into the front room where I slept, and I tied the door to keep him out, and he beat on the door and we couldn't get to sleep for him, but we wasn't so afraid of him. He went to the little house where his shotgun was and stood out in the door of the little house, and from there would go from the back door to the front door and would dare any one to open the door; he said that he would shoot the person that opened the door. He stayed there all night. My mother laid down in the room with us, and as soon as it began to get day we went out the back way, and I opened the dining-room door a little way to see if I could see him, and he pointed the gun then and would have shot if I had not shut the door. He was out on the sidewalk and saw me open the door. This occurred two or three years ago. He was always drunk

when he would curse and abuse mother. I have had him arrested several times when he would be cursing and abusing her. He has always treated my mother this way. When he would be sober I have known him not to be kind. Sometime in the night I heard her screaming, and I went in there and he was beating her with a stick, and I had seen him abuse her so often before that."
(13) Because the court erred in charging the jury: "The defendant is presumed to be innocent, and that presumption enters the trial with him and entitles him to an acquittal at your hands, unless the evidence has legally and satisfactorily established his guilt." (14) Because the court erred in charging the jury: "It is your duty, gentlemen, to weigh and consider all of the evidence of every kind bearing on all of the issues and every issue in the case, in determining finally whether the defendant's guilt is established in the case to the requisite degree of certainty that I have explained to you, that is, beyond a reasonable doubt, or not. If, after weighing all of the evidence, you are satisfied to a reasonable and moral certainty and beyond a reasonable doubt that the defendant is guilty, you ought to convict him. But if, after weighing it all and considering it all, you are not so satisfied, you should acquit him." (15) Because the court erred in charging the jury: "If, on the other hand, you do not find it established to the requisite degree of certainty that he (defendant) took her (deceased's) life as charged, or if you find that he did take her life, and find that at the time he was of such mental unsoundness as to be incapable of committing crime, and therefore irresponsible for an act which, if committed by a sane man, would be a crime, then you ought to acquit him." (16) Because the court refused, upon request therefor in writing, to charge the jury as follows: "The defendant in this case has also introduced evidence of his insanity at the time the alleged offense was committed. Proof of insanity is a complete defense to homicide. The burden of this proof is on the defendant, as all men are presumed to be sane until the contrary is shown. The defendant, however, does not have to show his insanity beyond a reasonable doubt, but only by a preponderance of the evidence. Therefore, if you find from a preponderance of the evidence that at the time the alleged offense was committed the defendant was insane, then you would be authorized and should acquit him." (17) Because

3

during the argument of the solicitor-general he asserted that the pole which had been introduced in evidence was the pole with which the deceased was struck, to which objection was made upon the ground that there was no proof of this, which objection the court overruled. (18) Because during the examination of Lockhart, a witness for the defendant, the following colloquy occurred: "Sol. Gen'l. 'You said that you got down to Roberts's house about eight o'clock.' Ans. 'I didn't.' Sol. Gen'l. 'I say that you did.'" This ground alleges that "Said statement of the solicitor-general [was] improper and prejudicial to the cause of the defendant," and was at the time objected to by the accused, "said objection not being entertained by the court." (19) Because the court erred in permitting the following colloquy between the solicitor-general and this witness: "Sol. Gen'l. 'And you hunted from half past eight o'clock in the morning until three o'clock and never saw a single man?' Ans. 'No, sir, I was in the woods.' Sol. Gen'l. Now wait'— Ans. 'I was hunting birds and things, and not folks.' Sol. Gen. 'The witness can get smart.'" It is alleged that the statement of the prosecuting officer was "improper and calculated to intimidate said witness and to prejudice the cause of this defendant."

*T. C. Latimore*, *T. R. Hudson*, and *Bale & Shaw*, for plaintiff in error. *John C. Hart, attorney-general, W. H. Ennis, solicitor-general*, and *Payne & Payne*, contra.

FISH, P. J. (After stating the facts as above.) 1. There is no merit in the usual general grounds of the motion for a new trial. The evidence that the wife of the accused had been murdered was clear and convincing, and the circumstances tending to show that he was the perpetrator of the crime were sufficient to exclude every reasonable hypothesis to the contrary. The jury were fully authorized to find that the evidence in reference to the insanity of the accused at the time the crime was committed was not sufficient to sustain this defense.

2-4. The circumstances tending to establish the fact that the deceased was killed with a curtain pole were sufficient to warrant the jury in finding that the charge in the indictment that she was so slain was sustained by the evidence; and there was no error in permitting the State to introduce in evidence the curtain pole re-

ferred to in the motion for a new trial.   The evidence showed
that at the time when the crime was alleged to have been com-
mitted the accused and his wife lived, by themselves, in a little
cottage, in Walker county, Georgia, about five or six miles from
the city of Chattanooga, Tennessee.   Wilson, a witness for the
State, who lived in three hundred yards of them, testified, that,
between three and half past three o'clock in the afternoon of Jan-
uary 13, of the present year, while he was chopping wood in the
forest, about three hundred yards from his own home and about
six hundred yards from that of the accused, the accused came to
him and said he was in trouble, and, upon Wilson asking him
what was the matter, said :   "My wife is dead.   I went to the
spring and came back, and she was dead as the devil.   I want
you to go to town and let my folks know, and let them come and
make arrangements."   The witness then went with the accused to
his house, and "saw his wife on her back, lying on the bed; she
was straightened out, her hands folded across her breast and her
eyes closed.   She was dead, covered up there with a blanket or
comfort."   The accused did nothing at the house, except to put
his hand up and shake her head and roll it about.   "She had on
a dress.   Defendant said he didn't know how she died, unless she
got strangled on snuff."   In a few minutes after he came to the
witness in the woods, the accused said his wife had been dead
about two hours.   At the house, the accused threw the blanket
back and let it stay back, and the witness saw a little blood on
the back of the hand of the deceased.   When the defendant came
to the witness in the woods, there was a little blood on his face,
but no wound or injury there; "it looked like it might have been
touched there from being on his hand."   The witness did not see
any bruises on the body of Mrs. Roberts, except on her hand.
"Her hair was down over her forehead, sufficiently to hide any
wounds that she might have there, if she had any."   The spring
is about one hundred and fifty yards from the house of the de-
fendant.   The accused did not point out any wounds, or say any-
thing about any wounds.   J. P. Tucker testified:   "I am coroner
of this county.   I was at the residence of the defendant, James
B. Roberts, on or about the fourteenth day of January last.   I was
sent for to come and hold an inquest. . .   I got there about ten
o'clock on the fourteenth, in the daytime."   There were some five

or six people there when he arrived, including Mr. Wilson, Mr. DeWitte, and Mr. Roberts's daughters. When he got there Mrs. Roberts's body was in the room, covered up. He made an examination of the body, and found the head crushed; "there were two bruises, one of the bruises was up on the head to the right, one on the head to the left. The skull seemed to be crushed down. . . The skull seemed to be soft, seemed to be mashed down. There was one on her left hand, seemed to be a gash, just like something had struck across; it was a cut." The witness further testified: "I made an examination in the room or about the house for a weapon. We found a curtain pole. [Here a pole was identified by the witness as the one found.] This is a curtain pole that had been used over a window. I found it in the house of Mr. Roberts on the fourteenth day of January, on the day of the inquest. The pole was lying right behind a big trunk. It was not in the room where Mrs. Roberts's body was lying; it was in the room next to Mrs. Roberts. It now appears like it appeared when I found it. It was fractured as it is now, it was broke on both sides that day; they seemed to be fresh breaks then. I saw a towel there that had some blood on it. It was hanging on a nail in the room where she was. I didn't see any blood on the bedclothing. I don't know as I examined the bedclothing at all. I heard Mr. Roberts make a statement about this transaction while I was there. He was intoxicated at the time he made the statement. When I got there, he told me that he had gone down to the spring; he says, 'I went down to the spring and fed my chickens, and when I came back I called to my wife and she didn't answer. I called her to get up,' to get dinner or breakfast, whatever it was, — I believe he said that he asked her to get up and cook something. He said that she didn't answer him, and he went in and saw that there was something wrong; said then he thought probably she had taken too much snuff or something, and he didn't know what to think, and he examined her and saw that she was gone. . . I did not make any examination of the stick, but the doctor and jury did. The wounds looked like they were made with something smooth, the skull or skin was not broken, and they had to be made with something smooth. The bruises about which I testified could have been made with any smooth stick, instrument, or weapon. I think that it would have to be

with some kind of a smooth weapon.    It might have been done with a smooth piece of iron, wood, or steel, or any sort of a smooth bludgeon.    It could have been caused by falling against a hard substance.    It could have been done by falling against a stove. It might have been done by falling down the steps, or anything that way."

Dr. W. H. Henderson testified: "I am a practicing physician. I was at the home of the defendant, James B. Roberts, in this county, about the fourteenth of January last, and examined the body of Mrs. Roberts.    When I saw her she was lying on a bed in the middle room; she was dead.    There were two wounds on the head, one just across the left part of the frontal bone, about three and a half to four inches long, and the skull was crushed in, something like half of an inch; and near the middle and top of the head, running to the right, there was another wound about the same length.    She had one wound on her hand and several what I took to be bruises over her body in different places.    The skin was not broken in those wounds on the head.    There was blood on her left hand and some blood on her face, and her nose had been bleeding.    Her face looked as though it had been washed off. She was dressed in her ordinary clothing, lying on her back, straightened out.    Her left hand was by her side and her right hand across her.    I examined the bedclothing; they were considerably tousled, and there was some blood on the sheet and bedclothing, and over on another bed, — no there wasn't another bed there, but a cot, and over behind that I found several quilts and bedclothes that had blood on them.    It looked as though they were thrown there.    I saw a towel that was brought into the room; it had a little blood on it, not a great deal; and looked as though some one had just taken it in their hands and wiped their fingers on it.    I saw this instrument (pole handed witness); I would take it to be a curtain pole.    It is my judgment that she died from a lick from some blunt instrument, because the skull was crushed in two places.    The wounds on her head were sufficient to cause her death.    This pole was broken when I saw it, just like it is now.    I found it myself in an adjoining room, behind a trunk.    The break appeared to be fresh.    I just placed this stick down in the wounds; they compared very well.    From the wounds that I saw and the examination that I made, it is my

opinion that such wounds, to be made, would have had to have been made with a round stick or iron. I think this stick could have caused the injuries. From the condition and appearance of the wound the blow which was necessarily inflicted would have been sufficient to have broken this stick as it appears now. It would take two blows to make the wounds I found on her head. . . I guess it must have been between ten and eleven o'clock in the forenoon of Saturday, January 14, that I got to Mr. Roberts's house. . . I went there at the instance of the coroner. I have examined the pole I have in my hand, and think the breaks I see in it appear to be fresh. A piece of poplar like this is will stay fresh quite a little while. . . It looks as fresh now as when I first saw it. The wound or bruise that I saw on the head could have been done with any kind of smooth instrument. It might have been done with a piece of iron piping, an axe-handle, or anything that was round and smooth. Any of the wounds that I saw on the head could have been made with a smaller weapon than this. The skull is to the brain about what an egg-shell is to the meat of the egg. If the skull was broken we could tell to some extent whether it was done by a large or small weapon; we couldn't say as to the exact size, because the wound might possibly rise up a little. It would be something like breaking an egg. I might use a small instrument on an egg and break a small piece out of it, and then again a large piece out of it with the same instrument. I think the instrument in this case must have been not less than one inch in diameter. But, as a matter of fact, I can't tell that, either from a scientific or practical standpoint."

We have set forth this evidence for the purpose of showing that the circumstances, as developed by the evidence, were, as we have said, sufficient to authorize the jury to find that the allegation in the indictment, that the deceased was killed by striking and beating her on the head with a curtain pole, was sustained by the evidence. We think the circumstances clearly indicated that the crime was committed in the room where the body of the deceased lay. There was nothing in the evidence tending to show that anything which, if used as a weapon, could have produced the fatal wounds on the head of the deceased, except the freshly fractured curtain pole, was found in the house or about the premises. From the description of

these wounds by the witnesses who examined them, the character and condition of the pole, its proximity to the dead body, its comparison by one of these witnesses with the wounds, and the result thereof, the fact that bloody bedclothes were found behind a cot in the same room where the body was, and this fractured pole behind a trunk in an adjoining room, the jury were warranted in finding that this was the weapon used by the murderer. The curtain pole, when identified by the witnesses who were present when it was found after the commission of the crime, was admissible in evidence. In *Betts* v. *State*, 66 *Ga.* 508, it was held: "The deceased having been found dead, apparently killed by blows from a blunt instrument, a maul found near him, which did not usually remain in that place, his hat found a short distance from him, and his shirt with blood upon it were admissible in evidence." In *Thomas* v. *State*, 67 *Ga.* 460, a murder case, in which the evidence showed that the deceased was found dead, with her throat cut and a contusion on the side of her head as though she had been struck, it was held that "A stick used by a defendant charged with murder, and left by him shortly after the crime was committed," at a house where he had spent the night, "bearing upon it stains apparently of blood, was admissible in evidence." And in *Franklin* v. *State*, 69 *Ga.* 687, a knife shown to have been in the possession of the accused a day or two after the throat of the deceased was cut, and then showing traces of blood, was held to be admissible in evidence. The mere fact that the accused had closed his evidence when the State offered to introduce the curtain pole did not render it inadmissible, and the solicitor-general had the right to argue to the jury that this pole was the weapon used by the murderer. Of course the jury understood that the statement of the solicitor-general, objected to, was merely his contention from the circumstances disclosed by the evidence; and this contention he had the right to make.

5. The testimony of Wilson, of Mrs. DeWitte, and Miss Roberts, respectively set forth in the motion for a new trial as having been admitted over the objection of the accused, was not inadmissible. In each instance the testimony was objected to upon the ground that specific acts of violence on the part of the

accused toward his wife, prior to the time of the homicide, were not admissible against him, and because the facts testified to were not part of the res gestæ of the transaction for which the accused was on trial. The circumstance disclosed by the testimony of Wilson, to which objection was made, standing alone, seems very slight and trivial, and, unconnected with other testimony in reference to the relations existing between the accused and his wife, was irrelevant and immaterial, but could hardly have been, by itself, prejudicial to the accused. It is, however, unnecessary to inquire whether this particular testimony, or that of Mrs. DeWitte, set out in the motion for a new trial, was admissible at the time when it was offered. If there was any error in admitting the testimony of Wilson when it was admitted, it was cured when the State subsequently introduced the testimony of Mrs. DeWitte and that of Miss Roberts; and if there was error in admitting the testimony of Mrs. DeWitte when it was offered, such error was cured when the testimony of Miss Roberts was introduced. For the testimony of these three witnesses, considered together, tended to show a long course of ill treatment and cruelty on the part of the accused toward his wife, extending down to a period of time shortly before the homicide, thus illustrating the state of his feelings toward her when the alleged crime was committed. This testimony bears upon the question of motive, and tends to show the alienation of the husband's affection for his wife, and also, in the language of Mr. Justice Brewer, in Thiede v. Utah, 159 U. S. 510, "tends to rebut the presumed improbability of a husband murdering his wife." "In cases of uxoricide the previous relations of the husband and wife and a course of treatment by one towards the other may be shown." 1 McLain's Crim. L. § 417; Hughes' Crim. L. and Proc. § 139; Underhill's Crim. Ev. § 333; 2 Bish. New Crim. Proc. § 630; Painter v. People, 147 Ill. 444; State v. Cole, 63 Iowa, 695; Boyle v. State, 61 Wis. 440; State v. Rash, 12 Ired. 382; State v. Bradley, 67 Vt. 465; Malce v. State, 33 Tex. App. 14; Thiede v. Utah, 159 U. S. 510; State v. Seymour, 94 Iowa, 699; Phillips v. State, 62 Ark. 119; People v. Colvin, 118 Cal. 349; People v. Buchanan, 145 N. Y. 1; People v. Decker, 157 N. Y. 156; Com. v. Holmes, 157 Mass. 233.

The evidence of Miss Roberts and that of Mrs. DeWitte and

Mr. Wilson tended to show a substantially continuous course of conduct by the accused toward his wife, the deceased. As was said by Morton, J., in the case last above cited, in reference to evidence similar to that now under consideration, "It tended to show a settled ill will and malice on the part of the defendant towards his wife, and therefore bore directly on the question whether there was any motive for him to commit the crime. It was not [admissible] ·for the purpose of showing separate and independent acts and threats, but for the purpose of showing a course of conduct. It was unavoidable that, in showing the course of the defendant's conduct, evidence of his acts and threats should be introduced. His course of conduct could not be shown so satisfactorily in any other way." On the same line, it is held, that, upon the trial of a husband for the murder of his wife, it is competent to show that he had become infatuated with another woman, in order to rebut the presumption of a husband committing such a crime, by showing the alienation of his affections and suggesting a possible reason for his desiring the death of his wife. Gillett, Ind. and Circum. Ev. § 59; People *v*. Harris, 136 N. Y. 423; and see *Shaw* v. *State*, 102 *Ga*. 660, where the accused was charged with wrecking a passenger-train, and where such evidence was held admissible, as his wife was shown to have been a passenger upon the train. There is nothing in the cases of *Pound* v. *State*, 43 *Ga*. 88, *Daniel* v. *State*, 103 *Ga*. 202, and *Horton* v. *State*, 110 *Ga*. 739, which are cited by counsel for the plaintiff in error, in conflict with our ruling in the present case. In *Pound's* case the homicide occurred in February, 1867, and the fact proved which this court held to have been inadmissible was, "that in October or November, 1866, the deceased spoke to the prisoner at the Sunday-school, and he did not answer him." This was a separate, distinct, and isolated occurrence; and the rule was laid down in the headnote, that evidence of this character must not relate to "a separate, distinct, and independent·act, but there must be some link of association, something which draws together the preceding and subsequent acts, something which gives color of cause and effect to the transaction, and sheds light upon the motives of the parties, to render such particular act or acts admissible."

In *Daniel's* case the error assigned was that the court refused " to permit the accused to prove that, several months before the homicide, he had procured a pistol to be used by a person in quelling a disturbance in which the deceased participated, and that ever since that time the deceased had borne him ill will and had repeatedly threatened. his life. The court had previously allowed proof of threats communicated to the accused, and the sole question raised by this assignment [was] as to whether it was competent to prove this act of the accused occurring several months. prior to the time of the homicide." It was held that it was not. The headnote dealing with this ruling of the court was, that, " It was not . . competent for the accused to prove that on a former occasion, remote in time from the day of the homicide, he had done an act which incensed the deceased; it not appearing that what occurred on that occasion was followed up by any subsequent quarrels or difficulties between the accused and the deceased, or that the act of the accused on the previous occasion tended to throw any light whatever upon his motive in taking the life of the deceased." In *Horton's* case it was held : " It is not, in a trial for murder, competent to prove that, years before the homicide, there had been a difficulty or quarrel between the accused and the deceased, without showing that in consequence thereof the former had continuously entertained hostile feelings toward the latter, or that the old grudge had something to do with the homicide." To the same effect, the plaintiff in error might have cited *Monroe* v. *State*, 5 *Ga.* 85, and *Hatcher* v. *State*, 18 *Ga.* 460. The distinction between each of these cases and the present one is obvious. These cases are authority for holding that an isolated act or incident, remote in time from the homicide, which tends to show that at the time of its occurrence there was ill will on the part of the accused toward the person he is charged to have murdered, or of such person toward him, is not admissible in evidence. But they are not authority for holding that a series of acts tending to show a course of conduct on the part of one party toward the other, affirmatively shown to have continued until shortly before the homicide, and tending to illustrate the state of feeling existing between them at the time of the homicide, is not admissible. This distinction was recognized in *Monroe's* case, when it was

said: "Repeated quarrels may be shown between the parties, to establish the malo animo; but you can not go back to a remote period, and prove a particular quarrel or cause of grudge, unless it be followed up with proof of a continued difference flowing from that source." In *Hatcher's* case, which was a case of assault with intent to murder, the trial court had ruled out testimony offered to show a fight between the prosecutor and the defendant, about two years prior to the alleged crime for which the accused was being tried; and this court held it was not error to require him, in introducing testimony of this character, to begin at the offense charged in the indictment and trace the relations or state of feeling between the parties back to the first difficulty between them. In the case with which we are dealing, this course, whether intentionally or otherwise, was the one pursued, the course of conduct of the accused toward his wife being traced backward from the homicide through a series of years.

The statement of the witness, Mrs. DeWitte, "I reckon he was angry or he wouldn't have hit her," was objected to as a conclusion of the witness; but even if the opinion of the witness, when accompanied by the facts upon which it was based, was not admissible, the accused could not have been hurt by its admission, as the conclusion from the facts stated by the witness was self-evident and irresistible. The testimony of Miss Roberts, which was introduced after the accused had closed his evidence and made his statement, was objected to upon the ground that it was not in rebuttal. There would be no merit in this objection even if the testimony of this witness was not in rebuttal of anything presented by the defendant. It is within the discretion of the court to reopen a case, for the admission of further evidence, even after both sides have announced closed and the argument has begun. *Hoxie* v. *State,* 114 *Ga.* 20 ; *Strickland* v. *State,* 115 *Ga.* 222; *Duggan* v. *State,* 116 *Ga.* 846. As a matter of fact, however, the testimony of this witness was in rebuttal of evidence introduced by the accused and of portions of his statement.

6. The testimony of Wilson, that the accused did not appear to be excited when he came to the witness in the woods, but did seem to be excited when the witness got back from Chattanooga, was objected to, "because how the defendant appeared

at the times witness testified about were mere matters of opinion and a conclusion of the witness, and not questions of fact that should go to the jury." This was not a good objection. In *Choice* v. *State*, 31 *Ga.* 424, it was held competent for witnesses to state that the accused "appeared to be drinking." In *Pierce* v. *State*, 53 *Ga.* 365, it was held that where it was competent to prove drunkenness, a witness might give his opinion thereon, after stating the facts on which he based it. In *Travelers Insurance Company* v. *Sheppard*, 85 *Ga.* 752 (8), it was held: "The manner and appearance of a speaker, whose acts and utterances belong to the res gestæ, are relevant evidence; and that he looked wild and seemed excited is matter of fact, not of opinion for which reasons ought to be specified. The signs of emotion may be described by the use of general terms, without any enumeration of particulars." In the opinion Chief Justice Bleckley said: "An observer may testify to the exhibition by another of excitement or any emotion such as alarm, without specifying the various minute facts which indicated the same to the mind of the witness. The emotions register themselves in the appearance and manner; and when a witness testifies to the existence of the emotion, his plain meaning is that he observed the numerous and often nameless indications by which that species of emotion is commonly manifested." To the same effect, see *Leary* v. *Leary,* 18 *Ga.* 696. It is very clear that there was no merit in the objection to this testimony, which took the broad ground that how the defendant appeared on the occasions referred to by the witness was mere matter of opinion which could not go to the jury. This ruling also disposes of the ground of the motion complaining of the admission of the testimony of Tucker, of a similar nature, over the same objection by the accused. But even if it did not, it is hardly conceivable that the testimony of Tucker, objected to as being the expression of an opinion, could have been at all prejudicial to the accused. The witness did not know whether the accused seemed to be excited or not when he saw him at the house, and so did not express any opinion upon that point. We do not see how his statement, that the defendant "seemed to be in trouble or something, he was taking on a great deal about it," could have been harmful to the accused. The fact that a husband, within a few

hours after his wife had been murdered and while her dead body was almost in his very presence, should seem to be in trouble and should be taking on a great deal, would certainly not, to a rational mind, be even a slight indication of his guilt. The most innocent and loving of husbands, under such circumstances, would doubtless seem to be in trouble and might take on a great deal about the awful calamity which had suddenly befallen him.

7. The assignment of error upon the charge complained of in the 13th ground of the motion for a new trial is, that its effect was to "withdraw from the consideration of the jury the statement of the defendant, and cause them not to give it that consideration contemplated by law." The error assigned upon the charge complained of in the 14th ground is the same. There is no complaint that the judge did not properly instruct the jury with respect to the prisoner's statement; and the entire charge, sent up with the record, shows that he did. It has been repeatedly held that it is not, upon the trial of a criminal case, error for the judge to shape his general charge to the jury upon the evidence alone and the law applicable thereto; but he should, at some stage of the charge, appropriately instruct the jury with respect to the prisoner's statement. If, however, a proper written request is submitted to the court to charge on any matter of defense set up in the statement, such request should be granted when the instruction requested is applicable to the matter of the statement and expressed in appropriate terms. *Vaughn* v. *State*, 88 *Ga.* 731; *Miller* v. *State*, 94 *Ga.* 1; *Lacewell* v. *State*, 95 *Ga.* 346; *Sledge* v. *State*, 99 *Ga.* 684; *Hoxie* v. *State*, 114 *Ga.* 19; *Hays* v. *State*, Ib. 25; *Tucker* v. *State*, Ib. 61.

8. There is no merit whatever in the 15th ground of the motion. The error assigned upon the instruction here excepted to is, not stating in this connection "the degree of evidence required to prove the mental unsoundness of the accused." The judge fully charged the jury with reference to the amount of mental capacity necessary to the commission of a crime; and further, that even although the accused was able to distinguish between right and wrong in relation to the homicide, at the time it was committed, yet if, in consequence of some delusion, his will was overmastered and he had no criminal intent, and the homicide was connected with the peculiar delusion under which

he was laboring, he would not be criminally responsible for his act. So, irrespective of the rule that a charge in itself proper is not rendered erroneous by a failure to give another appropriate instruction in the same connection, it is evident that the assignment of error is entirely without merit.

9. While the request to charge set forth in the 16th ground of the motion contained a proper statement of the law in reference to the degree of evidence necessary to sustain the defense of insanity, the request, as a whole, was not free from objection. It assumed that the defendant had introduced evidence of his insanity at the time the alleged offense was committed. He had introduced testimony the object of which was to show his insanity at such time, but whether this testimony was evidence *of* his insanity when the homicide was committed was a question for the jury alone. Suppose the court had instructed the jury that the State had introduced evidence of murder, would not such instruction have been erroneous? We think clearly so. Evidence upon the question of insanity and evidence of insanity are different things. Besides, the request treated any degree or form of insanity as being sufficient to render the accused irresponsible for the homicide, and so was too broad. The insanity which renders the perpetrator of a particular act, which would ordinarily be criminal, incapable of committing a crime by its perpetration is such as to deprive him of the capacity to distinguish between right and wrong relatively to such act. The perpetrator may be insane in a loose and general sense, and yet be, in the eye of the law, sane and responsible so far as the act in question is concerned. The refusal of the court to charge as requested was, therefore, not erroneous.

10. While the conduct of the solicitor-general, complained of in the 18th ground, in disputing the answer of a witness for the defendant, on cross-examination, in reference to what he had previously testified as to the time that he got out to Roberts's house, was improper, and, upon objection thereto, was not rebuked by the court, yet it was not such as to require the grant of a new trial. The prosecuting officer should not have disputed the answer of the witness; but as the jurors had heard and doubtless remembered the previous testimony of the witness on the point in question, they were not all likely to be influenced

or misled by this remark of the State's counsel. Besides, the question about which the dispute occurred was not at all material. The last ground of the motion seems too trivial for discussion. As the evidence fully warranted the verdict, and there was no error in overruling the motion for a new trial, the judgment of the court below is

*Affirmed. All the Justices concur, except Simmons, C. J., absent.*