## MILLER *v.* THE STATE.

ATKINSON, J. 1. Where the accused was upon trial under an indictment charging him with the murder of his wife, the jury having authority, in case of a conviction, to find him guilty without a recommendation to mercy, or to recommend him to life imprisonment (Penal Code (1910), § 63), it was competent to introduce evidence tending to show that at the time of the homicide the woman was in an advanced and apparent state of pregnancy, as bearing upon the enormity of the offense and furnishing ground for the consideration of the jury in determining whether or not a recommendation to life imprisonment would

be proper. *Withrow* v. *State*, 136 *Ga.* 337 (4) (71 S. E. 139); *Hart* v. *State*, 141 *Ga.* 672 (81 S. E. 1108).

2. At the trial, in October, 1923, of a defendant for murder of his wife, under an indictment alleging that the homicide was committed on May 11, 1923, by striking the victim "with a certain gun, pistol, and heavy blunt instrument to the grand jury unknown," the homicide was proved by uncontradicted evidence, but the identity of the person who committed the crime was a question for determination which depended entirely on circumstantial evidence. A brother of the deceased testified, as a witness for the State, that "about five or six years ago he talked with the defendant "after a row they [defendant and his wife] had." Witness asked defendant "what made him treat my sister so," to which defendant replied that "at times he would get fretted;" whereupon witness said, "There is no use of that; some time ago you broke her arm, and Dr. Riley treated her." The witness did not testify that the defendant stood mute, or·that he did not deny the charge that he had broken his wife's arm. *Held:* (*a*) The language of the witness should not be construed as testimony that the defendant in fact broke his wife's arm, or as testimony of an admission by the defendant that he broke his wife's arm. Before testimony of the character mentioned could be treated as testimony of an admission by the defendant, it would be incumbent on the State, offering it as an admission, to show affirmatively that at the time the defendant was so charged ·by the witness, he stood mute or failed to deny the charge. (*b*) The language of the witness amounted to testimony that at an undesignated time prior to "five or six years" before the trial, the defendant and his wife had "a row."

3. Another witness (a physician) was asked, on direct examination: "Did you ever attend her before for anything she had received from her husband?" The witness answered: "Two years ago her father brought her up to me; there was a wound under her arm caused by a lick from some instrument; if there were any other scars on her they were some old scars—in my opinion as a physician caused by a lick." On cross-examination the witness testified: "I don't have any idea how these wounds were caused, of my own knowledge." *Held*, that the language of this witness should not be construed as testimony that the defendant inflicted the wound that was examined by the witness, or caused any old scars on the person of the woman.

4. There was no other evidence tending to show that the defendant inflicted the wound or scars as referred to in the preceding note. In these circumstances the testimony to which reference was made did not tend to show ill-treatment of the woman by the defendant.

5. Other testimony was to the effect that on the night of the homicide the wife, being in an advanced stage of pregnancy, was left with her small children at home by the defendant, who went off to a party, and that before leaving they had "a fuss"—"some words" about his going. In the case of *Horton* v. *State*, 110 *Ga.* 739 (35 S. E. 659), this court ruled: "It is not, in a trial for murder, competent to prove that, years before the homicide, there had been a difficulty or quarrel between the accused and the deceased, without showing that in consequence thereof the former had continuously entertained hostile feelings towards the

latter, or that the old grudge had something to do with the homicide; and, as a rule, the connecting evidence should begin with the killing and travel backwards to the original difficulty." See also *Scrutchens* v. *State*, 146 *Ga.* 189 (3) (91 S. E. 25). *Held:*

(a) The "row" referred to in the second division above, and the "fuss" just referred to, related to isolated difficulties between the husband and the wife, long separated in point of time, and not shown to have any relation to each other or to any cause or motive for the killing. When all of the testimony is considered together, the testimony as to neither of the above-mentioned difficulties tended to throw light on the issue being tried. In the circumstances such testimony was inadmissible. *Baker* v. *State*, 142 *Ga.* 619 (83 S. E. 531).

(b) The case differs on its facts from the decisions of *Shaw* v. *State*, 60 *Ga.* 246, and *Roberts* v. *State*, 123 *Ga.* 146 (51 S. E. 374). In neither of those cases were difficulties involved in which both parties participated and either might have been at fault. In both cases it affirmatively appeared what the transaction was, so that its relevancy to the question at issue might be determined. In the former case the testimony objected to related to declarations by the husband, four years before the homicide, that he had beaten his wife and thought he had a right to beat her. There was other testimony tending to show that the woman was killed by being beaten with a lightwood knot. The testimony was held to be admissible as tending to identify the murderer. In the latter case the evidence objected to tended to show a long course of ill-treatment and cruelty on the part of the husband towards the wife, continuing until shortly before the homicide. This was held to be admissible as tending to show malice and motive, and to rebut the presumed improbability of a husband murdering his wife. In the case under consideration the evidence objected to was not shown to be acts of cruelty or ill-treatment upon the part of the husband towards the wife, and nothing was shown as to the character of the "row" or "fuss" between the husband and wife, so that it could be determined that those transactions had any relevancy on the questions at issue.

6. On its facts the evidence did not make a strong case for conviction, and the error in admitting the testimony as to the previous difficulties referred to in the preceding notes is cause for reversal of the judgment refusing a new trial.

*Judgment reversed. All the Justices concur, except Hines, J., dissenting.* GILBERT, J., concurs in the judgment.

No. 4126. SEPTEMBER 4, 1924.

Indictment for murder. Before Judge Park. Jones superior court. December 1, 1923.

Andrew Miller, upon wholly circumstantial evidence, was convicted of the murder of his wife, Leah Miller, and recommended by the jury to the mercy of the court. His motion for new trial, based on the usual general grounds, and three amended grounds which related to rulings of the court on the admission of evidence offered by the State, was denied, and he excepted. The evidence,

together with the prisoner's statement before the jury, was substantially as follows: On the night of May 10, 1923, there was a party or "barbecue" at the residence of Willie Adams, which was about a mile from the residence of the defendant. The defendant left his home between 9 and 10 o'clock and attended the party. Among others who were present was a man called Karsted Anderson, who lived at the home of the defendant's father, which was between the residence of defendant and the place where the party was held, being about three fourths of a mile from defendant's residence. The party lasted until 12 or 1 o'clock, after which Karsted and defendant left for their respective homes together. Karsted left defendant at defendant's father's home, and the defendant went to his own home. In his statement before the jury the defendant explained what he there saw and did, in the following language: "And I went back to my house; going in the house the house was dark, and I struck a match, and just as I reached the door to her room I saw my wife lying across the foot of the bed with the pistol in her hand, and I went and tried to wake my children to find out what was the matter, and the oldest boy got about half wake; and I found out he didn't know nothing, and I went to my father and asked him for some advice, and I went to Mr. Bivins and then to Mr. Andrews; and Karsted went with me." Mr. Bivins the person referred to in the prisoner's statement, being sworn as a witness for the State, testified, that the next morning "just about light" he was in bed and was called by Karsted, who said Andrew Miller wanted to get some information about what to do with his wife, saying that she was dead. Andrew Miller, who was also present, stated to witness that he left his wife about 9 o'clock and went to the barbecue, and that when he returned home about 1:30 o'clock he found her lying on the bed. Witness asked if she killed herself, to which defendant replied that he "didn't know, she must have shot herself, there was a pistol lying there by her; and he said he left the pistol in the dresser-drawer." Witness advised him to call the coroner and hold an inquest; there was nothing said about burying his wife up to that time. He went on to Mr. Andrews (the justice of the peace), and in about an hour's time returned at 4:30 or 5 o'clock and told witness what Mr. Andrews said. Defendant then said he wanted to go to witness's store and buy some shoes for his chil-

dren to wear to the funeral. He also asked if witness knew where he could get a hearse to carry his wife to the cemetery.

Andrews, the person referred to in the prisoner's statement, was also sworn as a witness for the State, and testified substantially as follows. He is a justice of the peace. Defendant and Karsted came to his house next morning after the party, "about good light," and the following dialogue took place: "Andrew [Miller] said, 'Mr. Andrews, I came over here for some advice.' And I said, 'What is the trouble?' And he said, 'My wife killed herself last night.' I said, 'How did she kill herself, Andrew?' And he said, 'She shot herself with my pistol.' And I said, 'Where were you, Andrew?' And he said, 'I was at Will Adams' party.' I said, 'Did you and your wife have any trouble before you left home?' He said, 'No, sir.' And I said, 'Andrew, you say she shot herself with your pistol; where did you leave it?' 'On the mantel-piece,' he said. And he said, 'Mr. Andrews, I have always taken you to be a friend to me. I want you to go over there. I want to bury my wife as soon as I can this morning by ten o'clock.' And I says, 'Have you invited her people?' And he said, 'No.' And I said, 'Who was at your house when she killed herself?' And he said, 'Nobody but the children, and they were asleep.' And he said, 'I left home about nine o'clock I reckon, and went to Will Adams' party, but before I left home my wife told me, "When you come back you will find me dead."' And I said, 'You laid your pistol on the mantel-piece after your wife told you that?' and he said, 'Yes sir, I never give it a thought.' And I said, 'You can't bury your wife until there is an inquest.' And I said, 'You go to Mr. Bivins and get the coronor to go over there, and I will go with the coroner over there when he comes.'" Then defendant left going in the direction of Bivins' store, and afterwards returned with some bundles in his hands; and then the further dialogue occurred: "He said, 'I want to bury my wife as soon as I can,' and says, 'Is there any hearses at Haddock's station?' And I said, 'No, you can get a hearse in Milledgeville.' And he said, 'I haven't got any money for burial expenses.' I says, 'You can get a casket from Mr. Moore; he is a reasonable man, and won't charge so much for the service of a hearse.' And I said, 'Andrew, what time did you get back home last night?' And he said,

'About two o'clock.' And I said, 'Where did you find your wife when you got in there?' And he said, 'I found my wife dead, lying on the bed, with my pistol grasped in her hand'—he didn't say what hand. And I said, 'That is mighty bad.'"

The sheriff, sworn as a witness for the State, testified, that he arrested the defendant on Saturday following May 10, and the defendant made to him substantially the following statement: He learned his wife was dead when he got home; he pushed the hall door open, and went in to his wife's room, and struck a match and looked under his arm. He knew she was dead. He could see the blood on the bed-clothes. He did not wake his children. Witness further testified: "I found a couple of empty cartridges in the fireplace, and I picked up pieces of clothes charred, but I couldn't tell what it was. When I got to the jail with him (defendant) I searched him and found a wad of money rolled up in a rag. He said, 'You can keep it.' I think it was even two hundred dollars; and he also had a life-insurance policy on his wife Leah, as well as I remember, for two hundred and fifty dollars, made payable to him. . . I went down there Sunday and made this investigation of the house. This defendant had been in jail ten or twelve hours at that time. I went to arrest this defendant about two o'clock. I told him I didn't have any warrant, and I told him I would hold him until I could get a warrant; and he said he would come without one."

Otis Batchelor, a witness for the State, testified that he was bailiff for the coroner when the inquest was held. Witness "examined the pistol; it was lying on her breast with her left hand on top of it, and the barrel towards her mouth, and there was a hole in the side of the house would correspond with the direction from where she was, and the hammer was on an empty chamber." James Richardson testified that he saw the defendant at his home about 8 o'clock next morning after the party; saw a spot of blood on defendant's sleeve. R. B. Bernard testified for the State, that he was present at the coroner's inquest; and further: "I heard Andrew Miller say he and his wife had a little fuss about his going to the party; said he told her he wanted to go to the party, and said some time previous to that she had gone to a party and broke it up. And said he asked her was she going to be confined that night, and she said no. And that he walked on out and met

up with some boys going up the road, and said he kept on walking with them clean on until he went to the party. He said he and his wife had a fuss before he left."

Dr. Riley, a witness for the State, was asked: "In reference to pregnancy, what was her condition?" and answered: "She was about her full time." He also testified: "I saw her on the morning after the Will Adams' party, in the morning about ten o'clock; several others were with me when I went in the room where she was. She was lying kinder with her feet on the floor, and a sheet over her, and I pulled the sheet back. She was dressed in an ordinary every-day dress, with shoes off, with the pistol lying on the fingers of the left hand. Rigor mortis was complete. I would say she died with the pistol placed on her hand afterwards—it was lying on her fingers, and not in her palm. In my opinion she had been dead five or six hours—the blood had time to clot; it seems she had fallen on her side. When rigor mortis is complete, an expert might tell how long a person has been dead. I could not. Yes sir, this was in Jones County that I found this body. She seemed to have had a blow under the chin with a blunt instrument, there was a complete fracture of her lower jaw, and the lower teeth had gone up over the upper jaw. I made a close examination of her person, and found no pistol, or gunshot wound on her. In my opinion the shock and hemorrhages, as the result of this wound, caused her death, from the wound under her jaw. I wouldn't say it wasn't possible for this blood to have got on the ground from the position she was then lying in—she had to be moved. In my opinion from all the surroundings, she was killed on the bed. I didn't see any sign of this woman having committed suicide. I examined inside of her mouth, and didn't see any pistol-ball wound there. Two years ago her father brought her up to me; there was a wound under her arm caused by a lick from some instrument—if there were any other scars on her they were some old scars—in my opinion as a physician caused by a lick. I don't have any idea how these wounds were caused, of my own knowledge. I don't know anything about a wound Dr. Hall treated." On being recalled the witness testified: "When I made an investigation of Leah Miller I found finger-prints on her arms—it showed bloody finger-prints on her arms after she was dead. No, I don't know whose finger-prints they were. That was about ten

o'clock the next morning." In response to a question by the court as to whether the woman could have inflicted the wounds herself, the witness testified: "I don't think she should, judge, she was hit right in front."

Peyton Pitts, sworn for the State, testified: He was informed of Leah Miller's death by Drew Patterson, who woke him up at 4 o'clock. He went to the house of defendant with Drew Patterson. The house contained four rooms. The defendant's four children were in bed, and appeared to be asleep. The largest girl woke up and said, "Look at the people in here," and laid down and covered up her head. Leah Miller was in another room, into which witness and his companions did not go. It was a cold night, and there was a little fire and some little rags burning in the fireplace. Those rags smelled like bad eggs. Charlie Ford testified: He saw defendant at the party, and saw him have a pistol. It was a large pistol. Defendant said he "wanted to buy some fresh meat to carry home to Leah," and he broke off some of witness's meat. Theodas Gray, for the State, testified: He was "going on 17 years old," and lived at the home of one Pitts, which was about 400 yards or a little more from the home of defendant. Witness attended the party, and returned home just in advance of defendant; heard defendant singing and knew his voice. Witness had reached the Pitts home, and had closed the door of his room, and was fixing to lie down when he heard a door slam in defendant's home, and in 2 or 3 minutes afterwards heard two pistol shots. Stanley Hill testified: He was a brother of Leah Miller. About 5 or 6 years ago he "talked to Andrew Miller and Leah after a row they had," and "he said at times he would get fretted, and I said, 'There is no use of that; some time ago you broke her arm, and Dr. Riley treated her.'"

In his statement before the jury the defendant denied that he killed his wife or that he knew who killed her, and said that all he knew was that he found her dead with the pistol in her hand when he got home from the party. He also stated that his wife asked him when he left home to bring her some fresh barbecue, and that he brought her some when he came.

*F. Holmes Johnson* and *Willard W. Burgess,* for plaintiff in error.

*George M. Napier, attorney-general, Doyle Campbell, solicitor-*

*general, T. R. Gress, assistant attorney-general,* and *A. Y. Clement,* contra.

HINES, J., dissenting. The decision of the majority of the members of this court is based upon the admission of certain evidence dealt with in headnotes 2, 3, and 5. The sole ground of objection to this testimony as to previous rows and fusses between the defendant and his deceased wife is that this testimony was irrelevant and immaterial. "In cases of uxoricide the previous relations of the husband and wife and a course of treatment by one towards the other may be shown." Such evidence tends to show malice and motive and to rebut the presumed improbability of a husband murdering his wife. *Roberts* v. *State,* 123 *Ga.* 146 (51 S. E. 374); *Lindsey* v. *State,* 145 *Ga.* 9 (88 S. E. 202). As against the objection that it was irrelevant and immaterial, this evidence was properly admitted by the court. The fact that there might be other valid grounds of objection to its admission, which were not urged at the time the evidence was admitted, and on which the trial judge did not pass, does not afford ground for reversal of the judgment of the lower court. This court must deal with objections urged against the admissibility of the evidence in determining whether such evidence was properly or improperly admitted. For the above reasons, I cannot concur in the opinion of the majority.