## STANFORD v. THE STATE.

1. It is not a conclusion for a witness to state that the defendant was wrought up by certain conduct of the deceased.

2. A ground of a motion for new trial which does not present sufficient facts to enable the court to determine whether the admission of certain evidence constituted error, without an examination of the brief of evidence, presents no question for decision.

3. Grounds of a motion for new trial which complain of improper argument by the solicitor-general, and of the competency, bias and prejudice of jurors, and which set up newly discovered evidence, need not be considered, as the grant of a new trial on another ground renders their consideration unnecessary.

4. When the defendant sets up alibi as a defense, the burden of proof is on him to establish this defense, not beyond a reasonable doubt, but to the reasonable satisfaction of the jury.

5. An instruction which put upon the defendant the burden of establishing this defense to the satisfaction of the jury and to a reasonable certainty, imposed upon the defendant a greater burden than the law imposes, and requires the grant of a new trial.

6. Other than the charge upon the subject of alibi, we find no errors which require the grant of a new trial; and as a new trial is granted, we do not pass upon the weight or sufficiency of the evidence.

No. 2908.    APRIL 12, 1922.

Indictment for murder.    Before Judge Summerall.    Bacon superior court.    October 6, 1921.

J. R. Dedge, Floyd Dedge, and D. Stanford were jointly indicted for the murder, on July 10, 1920, of C. J. Meddows, in the county of Bacon. The defendants were tried separately; and Stanford was found guilty, with a recommendation. His motion for a new trial was overruled, and he assigns error on that judgment.

The evidence for the State was as follows: C. J. Meddows, the deceased, between nine and ten o'clock at night on July 10, 1920, was shot in the back in front of his place of business in Alma, there being seven or nine shots found in his person within a diameter of six or seven inches, from which he died. Stanford and Floyd Dedge were in Alma on the afternoon of that day. Floyd Dedge had some repairs made on a Liberty-Six automobile at the garage of R. E. Jarmans. The repairs were made by W. R. Holton. The tires on this automobile were nonskid. Floyd Carter saw an automobile coming from Rockingham and going in the direction of Alma on the night of the 10th of July. It came down the lane from Dave Pittman's. Two roads come in a northern direction from Rockingham. One comes in at the lower crossing right at the

schoolhouse, turns there and comes to Alma. This automobile came down the road there at the schoolhouse, turned and came towards Alma. It came from towards Dave Pittman's home. There is a road up there that goes on over to Dr. Dedge's farm. There was but one light on the front of this automobile, and no rear light. There were two separate automobile tracks in the road down there. One track turned up further towards Rockingham than it did when the car was going the other way. It was drizzling rain. One track was a little bit dim from the rain. From this fact one could tell which track was freshest, which was the one going back. One track came towards Alma, and the other went back. Both were the same, and made the same kind of tread. It was about 8:30 p. m. when Carter saw this automobile. An automobile with only one headlight was seen being driven around the streets of Alma that night. One side curtain was up on this car. There were three people in it, two on the front seat and one on the rear. This car passed the store of the deceased three times, and every time it was thrown out of gear and rolled on. The shooting was at the third time it passed the store and was slowed up. The gun fired from the rear seat of the car. After the shooting, the car went right straight on down the street until it passed Rabonwitz's building, and turned down the left street. The witness G. W. Courson, who saw this car as it passed the store of the deceased on these occasions, did not recognize any of the defendants as being in it, although he was well acquainted with them. Dr. Dedge was about six feet tall. The men in this car looked to this witness to be small men. The three defendants were seen, according to Johnnie Altman, a stepson of the deceased, sitting in an automobile in Alma that night — Floyd and Dr. Dedge on the front seat, and Stanford on the back seat. One curtain was up by the front seat, but none by the back. All the store lights were shining. One light of the automobile was on.

John D. Johnson testified, that D. Stanford was in Thompson's restaurant in Alma the night of the homicide. A car drove up in front of the restaurant about the time he came, or just a short while before he came in. After he went out he stepped back to the car. This was twenty minutes or more before the deceased was killed.

Jeff D. Flowers testified, that he was fifty-four yards from the scene of the homicide. Heard the sound of the gun. The shot

that killed the deceased was fired from near the automobile that was in front of his place. The automobile came from the direction of the depot. It was moving slowly toward the place of the deceased. At the time the gun fired it was right in front of the deceased's place. After the gun fired they drove on up to Rabonwitz's corner and turned down Decatur street. It did not have any rear light. The automobile was close to the sidewalk. There were two tracks. One was the track of this particular car. We traced it on out. The shooting occurred not earlier than nine o'clock, probably between nine and nine-thirty at night.

W. H. Abbott testified, that he was in Alma the night of the killing. Saw the light of the gun shooting. The gun was fired from the car. Saw the car before the gun fired. It was going across the street from Young's wholesale house. It was running a moderate speed. When it got in front of deceased's store a gun fired. The automobile then moved on swiftly.

The wife of the deceased testified, that the defendant Stanford came to her house three or four weeks before her husband's death, and tried to get her husband to go off with him. He told her husband that Dr. Dedge was gone, and that he and Floyd had his car. He wanted her husband to take his gun. This was after ten o'clock at night. He told the deceased to get ready. The defendant asked the deceased what he was doing in bed at that time of night, and the deceased told him it was time everybody was in bed. Finally, the deceased said he couldn't go with him. In about three weeks the defendant came back, trying to get the deceased to go again, and said they would carry him and bring him back. They said they just wanted him to go and ride around with Jim. This was on Friday night before the deceased was killed the next Saturday week. It was late in the night. They had all retired. On that night the defendant wanted the deceased to go with him to marry a couple, and the deceased said, " No, bring them up here." The defendant said there were other parties that would interfere, and told the deceased to get his gun and come on. The deceased told him he couldn't go, that he couldn't go off and leave his wife, who was sick. That was the third and last time. The deceased lived on Dr. Dedge's farm from May, 1914, to November, 1919. The defendant lived at Dr. Dedge's place two or three years while the deceased was there. The deceased was looking after Dr. Dedge's

property. The deceased rented the defendant a portion of the land that the latter rented. The defendant and the deceased lived there together, and got along "perfectly peaceful." When the defendant first came to the home of the deceased he wanted the latter to go off with him, to just ride around. The defendant said he would carry the deceased and bring him back. Defendant was a friend of the family of the deceased. The defendant never showed any disposition to hurt any of the family. There were never any hard words between him and any of them. This witness said she was afraid to trust him. There was some feeling because Judge Meddows handled some claim against the defendant, the foreclosure of a lien on a horse. "They" had a mortgage note on the horse. The defendant got wrought up about it. She knows that the defendant was mad with the deceased about it. The deceased, as justice of the peace, had a mortgage note on a horse of the defendant. Never heard the defendant make any threats or say anything out of the way to the deceased on that account. The way they acted about paying the note would show anybody that they were mad. The defendant did not come to make any arrangements about it. They had trouble about it.

A. H. Carter testified, that in July, 1920, he was living in the Meddows building in Alma. On Friday night before the killing the next night week the defendant came to Mr. Meddows' home. It was just about eleven o'clock at night. Witness and the deceased both lived in the upstairs of this building. Witness was standing right out near the door when the defendant passed him. The defendant did not speak to him until after he had passed the witness. When the witness spoke to the defendant the latter spoke back. It seemed like the defendant changed his voice or something or other. The defendant turned his head kind of from him, it looked like. Witness does not know what passed between the deceased and the defendant on this occasion. There was nothing in the defendant's acts or conduct to indicate that he went up there for any purpose that was wrong, that the witness knows of. Witness thought a little strange of the defendant passing him at that time of night without speaking. Thinks anybody would have seen him. A man couldn't help seeing him. When the witness spoke he said, "Hello, D. Stanford," and the defendant said, "Hello there, Alvie."

J. N. Brown testified, that he made an investigation of the automobile tracks at the place of the homicide. He followed the tracks from the front of the door where the deceased was shot. It was a peculiar track. Followed it across the creek and below Rockingham a piece. The track left the scene of the homicide, went to the corner of Rabonwitz, turned down the next street by witness's house, turned to the right street, and crossed the bridge over the railroad. It took the highway from there on towards Rockingham. At Rockingham it turned to the left road at the church, and went from there to a little road out near Dave Pittman's, turned to the right through a little dull road, went into the other road at the corner of Dave Pittman's field. Witness didn't proceed very much farther below Pittman's before he stopped. At that point where it turned into that road that night he saw where a car had struck a lightwood stump. Saw Dr. Dedge's Liberty-Six car the next day. He drove the car in. Saw some sign on that car. It had apparently a lick on the right side of the car. The frame was bent in a little. The cuff that holds the spring to the axle was hit and had given away a little bit. There was some wood on the cuff. There was a grease cup short on it. This track was a Firestone non-skid tire track. It was a reasonably large tire. The car that Dr. Dedge was driving the next morning was a big car. It was a five or seven-passenger car. The tires on this car were a non-skid Firestone. This track was made by that kind of tire. Witness swears positively that this track that he picked up at the scene of the homicide was the same track that he traced to the point as far as he went; does not know how near he went to the home of Dr. Dedge; did not see the car that made the tracks which he followed. It was a short time after he heard the shot that he began to make investigation of the track. The non-skid Firestone tire is a common tire in this country.

J. S. Thomas, deputy sheriff, testified, that he was in Alma the night of the homicide, heard the shooting, and went to the scene. Tracked an automobile that night, and picked up the track in front of the store where the deceased was killed. It was a track that was easily distinguished from other car tracks. It was a non-skid Firestone. Followed it to Dr. Dedge's home. The track left the store, went to the second street going north, turned in an east direction, went two or three hundred yards, turned back another

road, crossed the railroad, crossed at the railroad bridge at the depot, struck the public road there, and went in an east direction; went to the edge of Rockingham, at the schoolhouse or church, turned to the left, went in a north direction for something like a half mile, and turned back in an east direction, where it left that road from Rockingham going north; it turned into a right-hand dim road, went on across that dim road into the far corner of Pittman's field, struck the older plainer road and went on from there to Dr. Dedge's home. Found the car in Dr. Dedge's garage. The track that he started from the store was the same track that went on to Dr. Dedge's garage. When we found that car in Dr. Dedge's garage, we went to the house and called him up. " When we turned out on the road going up to Mr. Pittman's to take this dim road, I saw a stump there that had been struck with a car. It was a fresh track. When the car struck the stump the right-hand wheel ran up on some good large roots that run out from the stump, and lifted up the axle a little to where it slipped up on the stump, and slid until the springs struck the sharp part of the stump and went on until it fastened itself. It had to stop. I saw the car at Dr. Dedge's. It was a Liberty-Six car. Saw evidences on the car where it had hit something. There was a fender, and there was a bolt through the end of the spring in that fender that held them together. The end of that bolt had been knocked off, and the fender was torn off from the end of the spring. The end of the bolt had been knocked off. That was a fresh break. There was a sign on the bottom of the axle where it had skidded on that stump." Never did see that Liberty-Six car after a day or two after the homicide. At that time the defendant D. Stanford lived about three or four hundred yards from Dr. Dedge's. This car that they tracked that night went by the home where the defendant lived, something like fifteen steps to the door. Didn't know anything about the track followed that night until somebody pointed it out to him. Going over this track found where other tracks had crossed it. When they crossed the railroad-track there was another car that had crossed this one, backing to. Only one or two car tracks had crossed this track from the time he picked it up until he got to Rockingham. It is a public road from there to Rockingham and is traveled a great deal.

· G. A. Taylor testified, he was in Alma the night the deceased

was killed. Heard the report of the gun. Saw two or three automobiles immediately after the shooting. Saw one across the bridge. This was three or four minutes after the shooting. It had only one front light. The car crossed the bridge and went east down by the side of the railroad. It had no rear light. It was a rather large car, and the curtains were up on one side. After it got up on the bridge it seemed to pick up speed pretty well. Don't know who was in the car. Saw some other cars. One was going in the same direction as this car was. It had two lights, it was a Ford.

B. B. Johnson testified, that he was employed by the Alma Mercantile Hardware Co. He sold the defendant some buckshot shells about ten days or two weeks prior to the homicide. They were U. S. black shells. There were nine shots to the shell. There are 0, 00, 1 and 2 grades. Those were 0 buckshot that he sold the defendant.

For the defendant, Clifford Johnson testified, that he remembered hearing of the occasion of the death of Jack Meddows. Knew Dr. Dedge prior to that time. " At that time I had a Buick roadster of Dr. Dedge's, and had let him have a Liberty-Six touring car. They were figuring on a trade. I loaned him this Liberty-Six; got it back a week or ten days after the homicide. There was a regular little grease cup on it, like there is practically on any other kind of car.

Riley Mebbers testified, that he remembered the night the deceased was killed. Left Alma that afternoon, right about coming of dark. Went the road leading from Alma to Rockingham. Aaron Johnson overtook him while he was going in that direction. Johnson overtook him right this side of the negro church on this side of the bridge. Johnson passed him, and drove on down the road. He did not go to Rockingham. Turned off at the ford of the branch the other side of the bridge.

Henry Harvey testified, that he remembered when the deceased was killed. Was at Alma the time he got killed. Had been there about two hours when he got killed. Arrived a little after dark. Came from Rockingham. Met Aaron Johnson on the road, right at the curve of the road across the creek at the bend where you take the old Baxley road. He was traveling toward Rockingham. At that time he lived over at the Dedge farm. Johnson lives about a mile beyond where he met him.

Mrs. Aaron Johnson testified, that at the time of the death of the deceased she lived on Dr. Dedge's farm. Aaron Johnson was at home part of the day, and then went to Alma. He got back about nine o'clock, she supposes, to Dr. Dedge's house. He stayed there about an hour or a little over, and then they went on home. He did not come back to Alma that night. He stopped at Dr. Dedge's house. She was over at Dr. Dedge's that afternoon. Went there that evening about sundown. Went over to cook supper for them. The doctor was not at home when she went there, but he came in a few minutes. He got there just about dark. Floyd came with him. When they got there they stayed around the house and played music. They ate supper. They had just eaten supper when her husband came. She was cleaning the dishes. They all stayed in the house and played music until a little after ten o'clock. After ten o'clock she and her husband went home.

Martha Stanford testified, that she was seventy-four years old. The defendant is her son. Remembers the occasion when the deceased was killed in Alma in July last year. That was Saturday night. Heard of it the next morning. At that time she lived near Dr. Dedge's building where he stayed, just across the creek. She and her son lived over there. He stayed at home all day. He had breakfast, dinner, and supper there. He stayed in the house pretty much all day. He went over across the creek where a darkey was working for him, late in the evening. He came back pretty quick. They ate supper at their home. They had supper just about time daylight shut down. After they had eaten supper he went down to the barn, but never stayed over ten minutes. It was sprinkling rain. There is one chimney to the house, and he had a bad spell in the winter, and he moved his bed in there to have the advantage of the fire, and they were both in the same room. She layed down pretty early that night so that she could rest. He just stayed there and read until he got sleepy. She had not gone to sleep when he retired. She never went to sleep until late in the night. Couldn't sleep more than half of the nights in those days. She is certain he never left that room that night. — Cross-examination: The defendant came to Alma that Saturday. He was in Alma the previous Saturday. He almost always comes out to Alma on Saturday. This particular Saturday she knows he did not come back, because it was raining.

Floyd Dedge testified that he was in town on the day when the deceased died. It must have been about eleven o'clock or eleven-thirty when he arrived. Dr. J. I. Dedge came with him. Came in a Liberty-Six automobile. Stayed here three hours before he left, and went back home. Went home about two o'clock. Nobody went with him. Dr. Dedge stayed in Alma. He is a dentist, and worked here in town. Witness didn't carry him back. He came back to Alma a little before sundown. It wasn't night. Nobody came with him. When he rolled up his uncle got in the car, and they went back through Rockingham, and from there on to Dr. Dedge's home. When he arrived at Dr. Dedge's home he found Mrs. Aaron Johnson there. She was there cooking supper. He and Dr. Dedge didn't go back to Alma any more that night. He did not sit in that car down here by Young's warehouse at the steering-wheel of that car with Dr. Dedge and the defendant. Saw the defendant that afternoon, at Dr. Dedge's home. · That was just a little after we arrived there, going back from there that afternoon on the second trip. Witness was jointly indicted with his uncle and the defendant for the murder of Meddows. When Aaron Johnson got to his house witness had had supper. Mrs. Johnson had finished cleaning up the dishes. He came right in and got his wife and children and went right home. He saw " us all " there that night. That was after nine o'clock. Aaron didn't eat supper there. He didn't go in the house, sit there, and play the graphophone about an hour. The children and the witness played the graphophone before he came.

Leon Wheeler testified: He does not recall the date the deceased was killed. Remembers the occasion. Got to town that afternoon about two o'clock. Went back home part of the way with Johnnie Altman and Mr. Johnson until they turned off, when he got out and walked on home. Does not know exactly when Johnnie and he left there that afternoon. It was after dark. It was after the train came.

J. H. Gordy testified: On the afternoon before that homicide occurred he was in Alma. He came about two o'clock. He expected to meet the defendant here. Wanted to see him. Did not have an engagement with him, but expected he would come over here. Walked up and down the street looking for him. Hung around Barnett's store and told Mr. Barnett to tell him, if he saw

him, where he would find witness. Kept noticing to see if he came in. Never did see him. Mr. Barnett's store is a two-story building on the right.

Bill Joe Gordy testified: I was in Alma on the afternoon before the death of Meddows that night. Arrived about twelve-thirty. Made a search for the defendant, after I got here. Looked for him from the time I got here until I left that evening just before sundown. Went from one street to the other looking for him. Didn't see him that afternoon.

Clayton Holland testified, that he was crossing the railroad on the night the deceased met his death, right back of Mr. Young's warehouse. Was right about the corner of it when the gun fired. " Don't know hardly how far it was from me over to the deceased's place. His place was on the opposite side of the street from me. Just as I crossed the railroad there were two cars passed over there. When I heard the sound of the gunshot I looked down that way. Saw some cars about the deceased's store. Saw two. Couldn't say what kind of cars they were. They were larger cars than Fords. There was one kind of over on that side of the street, about one car-length ahead of the other, as well as I could tell. They were brought over on the side of the street next to the deceased's store. One was further over than the other. Couldn't tell from which one the gun was fired. Don't know whether it was from the front one or the back one."

Mrs. Willie Carter testified: She was at home on the night of the death of the deceased, in Rockingham. Saw a car pass her house that night, going toward New Lacy. It was a quarter to eleven, by her time. This car went on down and crossed below the depot on the public road from Alma to Rockingham.

The defendant made a statement in which he denied having any connection with the killing of the deceased, and declared that he was not in Alma on the night of the killing. He denied that he entertained any bad feeling towards the deceased.

J. S. Lee testified: The latter part of May or the first of June, 1920, he went with the deceased to the defendant's house. Went with the deceased in his car. Saw the defendant. Stayed there something like an hour. The defendant and the deceased had a conversation. This conversation was out of the presence of the witness. They went out of the house together, and were gone about an hour.

For the State, in rebuttal, Gaston Courson, recalled, testified that he knows D. Stanford. Saw him Saturday that the deceased was killed. Saw him in the afternoon some time at Jarman's garage. On the former trial he testified that he could see the glimpse of three people in the car, two in the front seat and one in the rear. As a matter of fact he does not know who was in the car. Couldn't say whether it was these defendants at all.

G. B. Johnson testified: Was in Alma the night the deceased was killed. Left before the shooting. Saw Leon Wheeler. At the time Leon Wheeler was at the deceased's store, Johnnie Altman was there. He was there when witness went back. Witness met the passenger-train, and when he went back Johnnie was gone. Leon was there at the deceased's store. It was something like four or five minutes before Johnnie came.

Mrs. Emma Meddows, recalled, testified: She knows Leon Wheeler. He came to the store of the deceased that night. "Johnnie Altman is my son. He was there at the time I got supper ready. I asked him where Mr. Johnson, his father-in-law, was, and he said he was in town. I said, ' Get him, have him come to supper.' Johnnie was gone a pretty good bit. Mr. Johnson came before he came back. Leon Wheeler did not go with him. He was sitting on the bench in the front part of the store.

R. C. Wilson testified: He was in Alma the day the deceased was killed. The sun was about an hour and a half high, or something like that, when he saw the defendant in front of the post-office.

Lee Mercer testified: Saw the defendant the afternoon the deceased was killed. "Don't know just what time I saw him, but it was not much more than an hour by the sun." Saw him down at the Hurricane Bridge. He was coming to town. Witness was going home.

D. S. Pittman testified: "It is about a mile from where I live to where Dr. Dedge lives. I and a fellow were walking down the road towards Rockingham. We found a stump out there that looked like it had been hit by something. Didn't find any evidence of where the stump had been hit with anything that I could tell. Louis Raines picked up a piece of metal by the side of the stump. It looked like steel or iron. It was about the size of your thumb. It was round looking."

Floyd Carter, recalled, testified: Saw the defendant in Alma the day the deceased was killed, right about an hour by sun, or a little later, out there going across from the front of Jarman's Hardware store towards this restaurant building.

Clarence Carter testified: I was at this stump near Mr. Dave Pittman's where it is claimed an automobile hit it, on the occasion when Mr. Dave Pittman and Mr. Louis were there, but they were there before I was. I saw it. It was a grease-cup on an automobile.

*T. A. Wallace, Dickerson & Kelley, L. D. Luke,* and *Padgett & Watson,* for plaintiff in error.

*George M. Napier, attorney-general, A. B. Spence, solicitor-general, Seward M. Smith, asst. atty-gen., John W. Bennett, I. J. Bussell, A. J. Tuten,* and *H. L. Causey,* contra.

HINES, J. (After stating the foregoing facts.)

1. The defendant complains that the court erred in permitting Mrs. Emma Meddows to testify, over his objection that this evidence was a mere opinion of the witness and irrelevant, as follows: " I just knew that Stanford got wrought up about it," referring to the foreclosure of a lien by the deceased against the defendant. This evidence was properly admitted for the purpose of showing motive. *Boone* v. *State,* 145 *Ga.* 37 (88 S. E. 558). It was not subject to the objection that it was a mere opinion or conclusion of the witness. That the defendant was wrought up was a fact and not a conclusion. *Leary* v. *Leary,* 18 *Ga.* 696; *Travelers Ins. Co.* v. *Sheppard,* 85 *Ga.* 752 (12 S. E. 18) ; *Roberts* v. *State,* 123 *Ga.* 146 (6), 160 (51 S. E. 374) ; *Vincent* v. *State,* post, 278 (112 S. E. 120.)

2. The defendant says that the court erred in permitting H. W. Johnson, over his objection, to testify as follows: " No, I did not hunt her up. She sent for me. That gentleman came after me and said she wanted to speak to me." The objections urged to this evidence were, (1) that it was hearsay, (2) that it was calculated to prejudice the jury against the defendant, and (3) that it was calculated to mislead the jury. The circumstances under which this evidence was given are not narrated in the ground of the motion for a new trial complaining of its admission; and for this reason this court is unable to say whether the court below committed any error in letting this evidence go to the jury.

This court is not informed to what person this testimony refers. It can not be understood without an examination of the brief of evidence; and for this reason it presents no question for decision. *Sims* v. *Sims,* 131 *Ga.* 262 (62 S. E. 192) ; *Head* v. *State,* 144 *Ga.* 383 (87 S. E. 273). Sometimes hearsay evidence is original evidence. Civil Code, § 5763.

3. The ruling touching the competency of jurors to serve in this case is not likely to occur on another trial; and for this reason it does not require consideration. The same is true of the remarks of the solicitor-general, complained of in the seventh ground. As this officer withdrew the language complained of, we feel sure he will remember not to repeat it.

4. The defendant assigns error upon the following instruction to the jury: "The reasonable doubt which the law recognizes and gives the defendant the benefit of, where it exists, is not a vague, indefinite, or capricious doubt, but is such a doubt as arises from the evidence or want of evidence, and causes your minds to be wavering, halting, unsettled, undecided and refuse to reach a conclusion that is satisfactory to you." The errors assigned on this charge are, (*a*) that the phrase, "where it exists," amounts to an expression of opinion by the court to the effect that there was no doubt in the case, and (*b*) because the same confused and misled the jury. We do not think there was any merit in these objections to this instruction.

5. The defendant complains, in the ninth ground of his motion for a new trial, that the court failed to give in charge to the jury section 1009 of the Penal Code, which defines the different kinds of evidence therein mentioned. In the absence of a timely request the court did not err in failing to give this section in charge to the jury.

6. In the tenth ground the defendant complains of the following charge of the court to the jury: "The defendant in this case, as in all criminal cases, has the right to make to the court and jury such statement in the case as he may deem proper, in his own defense. That statement shall not be under oath, and shall have just such weight and credit as the jury think proper to give it. The jury may believe the statement in preference to the sworn testimony in the case, and if they see fit to do so they may disregard it entirely." The errors assigned are, (*a*) that this instruction

discredits the statement of the defendant; (*b*) that it did not instruct the jury that the statement of the defendant was not under oath; (*c*) that it emphasized the fact that the statement of the defendant was not under oath; (*d*) that it was prejudicial, because it imposed on him the responsibility of having delivered his statement unsworn to, when he had no right to testify under oath; and (*e*) that it failed to instruct the jury that they could believe his statement in part and disbelieve it in part. These objections are utterly without merit. Penal Code, § 1036.

7. The defendant alleges, in the eleventh ground of his motion for new trial, that the court erred in refusing to charge the jury, when timely requested, as follows: "One of the ways pointed out and fixed by the law for the impeachment of a witness is by proof of contradictory statements made by such witness, about a matter material to the issue in question. Now if you find from the evidence that any witness has previously sworn falsely about this case, that fact alone might be sufficient to authorize you to entirely disregard his evidence. If you should find that a witness has previously testified falsely about a matter at issue, and you further find that such witness claims to have so testified because of fear of bodily harm to himself, then I charge that if his life was threatened, and you are to look to the evidence to see if his life was threatened and he acted under the influence of those threats, believing that his life was in peril so much as to be unable to freely give the testimony, and he did swear falsely in consequence of the threats, apprehending danger to himself or life, then, gentlemen, under these circumstances it is a matter for you to consider whether or not it is a sufficient excuse for you to take his testimony. I charge you, however, that mere apprehensions of future injury to himself or life would not be such duress as would excuse witness for swearing falsely." This request does not embrace accurate statements of the law. The contradictory statements must be "as to matters relevant to his testimony and to the case." Civil Code, § 5881. Furthermore, the witness must have knowingly and wilfully sworn differently on the present trial from his testimony on the former trial, before his testimony on the present trial would be unworthy of credence; and even in that event the jury could believe the witness if corroborated. If the former testimony was given under duress, and impelled by fear for his life, such

testimony would not be wilful, and would not impeach his evidence given on the last trial. *Williams* v. *State*, 69 *Ga.* 11, 14.

8. In the twelfth ground of the motion for new trial, the defendant complains of the following charge of the court to the jury: " Now, if you find from the evidence that any witness has previously sworn falsely about this case, that fact alone might be sufficient to authorize you to entirely disregard his evidence. If you find that a witness has previously testified falsely about a matter at issue, and you further find that such witness claims to have so testified because of fear of bodily harm to himself, then I charge you that you have a right to consider the explanation made by the witness as to his previous false statement; and where the explanation is satisfactory to you, the witness may be believed with or without corroborating circumstances or supporting evidence; but if the explanation is not satisfactory to you, then you would be authorized to disregard his evidence entirely. I charge you, gentlemen, that you have no right to captiously disregard the sworn testimony or impute perjury to any witness, unless that witness has been impeached by some method known to the law." The errors assigned are, (*a*) because said charge was calculated to mislead the jury; (*b*) because it was an invasion of the province of the jury, who alone could determine whether the testimony of the witness was false; (*c*) because it was such a summary of the evidence of the witness as amounted to an expression of an opinion on the part of the court; (*d*) because it was an effort on the part of the court to repeat the substance of the testimony of the impeached witness, and to submit this, with the deductions drawn therefrom by the State's counsel, as the issue in the case; (*e*) because the same was prejudicial to the defendant's right, being highly in favor of the State, and served to bolster up the impeached witness; (*f*) because the same had the effect of singling out the impeached witness, and laying undue weight upon his testimony; (*g*) because it was an expression of an opinion upon the part of the court as to what the witness had testified to; (*h*) because the portion of said charge, to wit, " that you have no right to captiously disregard the sworn testimony, or impute perjury to any witness, unless that witness has been impeached by some method known to the law," being given immediately following the charge on impeachment, had the effect of practically instructing

the jury that they could not captiously disregard the testimony of the impeached witness; and   (*i*)   because the same was misleading and confusing to the jury.   None of these objections are well taken. In fact this charge was more favorable to the defendant than he was entitled to.

9.   In the thirteenth ground of the motion the defendant asserts that the court erred in charging the jury as follows:   "It is contended on the part of the State in this case that the three defendants, to wit, D. Stanford, J. R. Dedge, and Floyd Dedge, were present at the scene of the crime, and that all of them participated in the crime, and that they are all equally guilty.   It is further contended on the part of the State, that the defendant, D. Stanford, now on trial, actually fired the gun that took the life of the deceased and was the actual perpetrator of the crime, and that the other defendants named in the indictment, not now on trial, were present aiding and abetting the crime to be done."   The errors assigned on this charge are   (*a*)   that it is not a fair and impartial statement of the contentions of the State; and   (*b*)   because it amounts to an intimation or expression of opinion on the part of the court as to the defendant's guilt.   These grounds are not well taken.   As the contentions of the State are not given in this ground, this court can not say whether this charge contains a fair and impartial statement thereof or not.   Certainly this charge does not contain any expression of opinion on the part of the court as to the guilt of the defendant.

10.   In the fourteenth ground the defendant alleges that the court erred in charging the jury as follows:   "The defendant, D. Stanford, is jointly indicted with J. R. and Floyd Dedge.   I charge you that if there was a common design and purpose existing between the persons to do an unlawful act and to take the life of the deceased, any one of such persons would be responsible for any act done by another member in pursuance of the common purpose, as well as for all consequences which would naturally or necessarily result from any act done by any member of the party in pursuance of the common, unlawful enterprise."   The error assigned on this charge is that it is an expression of opinion by the court that there had been a conspiracy between the defendants to take the life of the deceased.   This is the sole error alleged.   It is without merit.   The court left to the jury to determine whether there

was a conspiracy between the defendants to take the life of the deceased, and expressed no opinion upon the existence of such conspiracy and common purpose.

11. In the fifteenth ground the defendant complains of the following charge to the jury: " So you look to the evidence in this case. Was there a common intent, common purpose, existing between D. Stanford, J. R. Dedge, and Floyd Dedge to kill C. J. Meddows ? Look at the evidence to see whether or not that is true. The defendant insists that it is not true. If you believe, from the evidence, that it was a common purpose shared in by all three of them, to wit: D. Stanford, J. R. Dedge, and Floyd Dedge, to kill C. J. Meddows, that they shared in the felonious design and purpose to kill the deceased, and that D. Stanford, in pursuance of such common purpose, shot and killed C. J. Meddows, or was present, aiding and abetting the act to be done, and further find that the other defendants were present in pursuance of a common purpose and design to do so, and under such circumstances either D. Stanford shot and killed Meddows, or one of the other defendants shot and killed him, when D. Stanford was present, aiding and abetting the act to be done, then I charge you that the defendant now on trial, to wit, D. Stanford, would be guilty and you would be authorized to so find." The errors assigned are (a) because the same was argumentative, and not a fair presentation of the law applicable to the case; (b) because it limited the jury to the evidence in the case, and did not allow them to consider the defendant's statement; (c) because said charge unduly states the contentions of the State; (d) because it is an expression of opinion by the court of what had been proved; (e) because it fails to fairly and impartially state the law of conspiracy; and (f) the evidence did not authorize said charge. None of these objections are well taken. The complaint that the court limited the jury to the sworn evidence, to the exclusion of the defendant's statement, is not well founded. The general tenor of the charge of the court on the trial of a criminal case should be shaped by the evidence alone and the law applicable thereto, adding, or at some stage of the charge incorporating, the statutory provisions touching the prisoner's statement. *Vaughn* v. *State*, 88 *Ga.* 731 (4), 738 (16 S. E. 64).

12. In the sixteenth ground error is alleged on the following

charge of the court: " When a defendant sets up as a defense an alibi, the burden is upon the defendant to establish his defense of an alibi to your satisfaction and to a reasonable certainty; but I further charge you in this connection that it is your duty to consider the evidence on the question of an alibi along with all the other evidence introduced in the case; and if all of the evidence, including the evidence introduced on the question of an alibi, considered in connection with the other evidence, or considered apart from the other evidence, creates in your minds a reasonable doubt as to the guilt of the defendant, then it is your duty to give the defendant the benefit of the doubt and acquit him." The error assigned is that this charge placed upon the defendant a greater burden than that imposed upon him by law. When the defendant sets up an alibi as a defense, the burden of proof is on him to establish this defense, not beyond a reasonable doubt, but to the reasonable satisfaction of the jury. *Harrison* v. *State,* 83 *Ga.* 129 (9 S. E. 542) ; *Miles* v. *State,* 93 *Ga.* 120 (19 S. E. 805) ; *Henderson* v. *State,* 120 *Ga.* 504, 506 (48 S. E. 167) ; *Raysor* v. *State,* 132 *Ga.* 237, 239 (63 S. E. 786) ; *Johnson* v. *State,* 146 *Ga.* 190 (91 S. E. 42). This instruction put upon the defendant the burden of establishing this defense to a reasonable certainty, and was tantamount to requiring him to prove it beyond a reasonable doubt. It is erroneous for the court to instruct the jury that the burden is on the defendant to establish this defense by a preponderance of the evidence. It was held that " less than a preponderance might be sufficient," and that such an instruction put a greater burden on the accused than the law imposes. *Bone* v. *State,* 102 *Ga.* 387, 392 (30 S. E. 845). For this reason a new trial must be granted. *Dedge* v. *State,* ante, 176 (111 S. E. 547).

13. In the seventeenth ground the defendant alleges that the court erred in instructing the jury as follows: " Gentlemen of the jury, in charging you this paragraph, I used the word ' not ' when I should have said ' You would be authorized.' Now I charge you that if you find this contention on the part of the State to be true, to a moral and reasonable certainty and beyond a reasonable doubt, then you would be authorized to convict the defendant now on trial, to wit, D. Stanford. In charging that, I used the word ' not,' and I should not have used that. It should have been, ' You would be authorized,' when I said ' you would

not.' That is all." The errors alleged are *(a)* that the court did not read to the jury the paragraph in his original charge therein referred to, thus leaving the jury without knowledge as to what paragraph he referred to; *(b)* that it is misleading and confusing; *(c)* that it amounted to a direction of a verdict against the defendant; *(d)* that it was prejudicial to the rights of the defendant. What happened was this: the trial judge reduced his charge to writing and read it to the jury. In reading the paragraph which is set out in this ground, he used the word " not," when it should not have been used. He then reread this paragraph with the omission of this word. We do not think that the jury could have been misled by this procedure. The other objections to this instruction are without merit. For these reasons it is not subject to the attacks made thereon in this ground of the motion for new trial.

14. In the eighteenth ground the defendant says that the court erred in charging the jury, immediately after charging section 42 of Park's Penal Code, upon the subject of principals in the first and second degrees, the following: " So, gentlemen of the jury. I charge you that if you find from the evidence in this case to a moral and reasonable certainty and beyond a reasonable doubt, under the rules of law given you in charge, that one of these defendants jointly indicted was the actual perpetrator of the crime, and that the other defendants were present, aiding and abetting the crime to be done, as defined to you in the law given you in charge, then they would all be equally guilty, and it would be your duty to convict the defendant now on trial. It is contended on the part of the State in this case that the three defendants, to wit, D. Stanford, J. R. Dedge, and Floyd Dedge, were present at the scene of the crime, and that all of them participated in the crime, and that they are all equally guilty. It is further contended on the part of the State that the defendant D. Sanford, now on trial, actually fired the gun that took the life of the deceased, and was the actual perpetrator of the crime, and that the other defendants named in the indictment, not now on trial, were present, aiding and abetting the crime to be done. I charge you that if you find this contention on the part of the State to be true, to a moral and reasonable certainty and beyond reasonable doubt, then you would not be authorized to convict the defendant now on trial, to wit, D. Stan-

ford." The errors assigned on this charge are, (*a*) because it instructed the jury that if either one of the defendants fired the gun, or if the defendant fired the gun, they would be authorized to convict the defendant; (*b*) because the same is not adjusted to the issues in the case, and is not authorized by the evidence in the case; (*c*) because it is an incorrect statement of the law; (*d*) because it is prejudicial to the rights of the defendant; (*e*) because it confused the law of principals in the first and second degree with the law of conspiracy; and (*f*) because it states inconsistent contentions on the part of the State. None of these grounds are well taken. As a new trial is granted in this case, we express no opinion upon the question whether the evidence was sufficient to justify this charge on conspiracy.

15. In the nineteenth ground the defendant contends that he is entitled to a new trial because of the newly discovered evidence therein set forth. As a new trial is granted in this case, the defendant will have an opportunity to present this evidence on the next trial of his case; and therefore it becomes unnecessary to consider this ground.

16. In the twentieth ground the defendant complains of bias and prejudice of one of the jurors who found him guilty. It is unnecessary to pass upon this ground of his motion for new trial, as the judgment of the court below refusing a new trial will be reversed; and this error, if any, will not be repeated on the next trial.

*Judgment reversed. All the Justices concur, except Fish, C. J., and Beck, P. J., dissenting.*

BECK, P. J. I dissent from the ruling made in the 4th headnote, for the reasons stated in the case of *Dedge* v. *State* (supra).

FISH, C. J., concurs in this dissent.